**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                     **Case No.  8:11-cr-134-T-17TBM**

**KAREEM ATWAN CUSICK,**

    **Defendant.**
                                              /

**REPORT AND RECOMMENDATION**

THIS MATTER is before the court on referral by the Honorable Elizabeth A. Kovachevich for a report and recommendation on **Defendant's Motion to Suppress Any and All Physical Evidence and/or Statements** (Doc. 24) as supplemented (Doc. 42), and the government's response in opposition (Doc. 27).[1] By his motion, the Defendant seeks to suppress a firearm and ammunition seized from a motor vehicle on or about January 25, 2011, by officers from the St. Petersburg Police Department. As clarified in the supplement, the Defendant also seeks to suppress any and all statements made by him subsequent to the stop and/or seizure of the firearm and ammunition. In response, the government maintains that the motion is untimely,[2] the Fourth Amendment was not implicated by this encounter and, in any

---

[1] Defendant has also filed a response to the government's claim that the motion to suppress was filed late. (Doc. 33). Additional filings were submitted on behalf of both sides. (Docs. 42, 44-46).

[2] As suggested at the hearing, while the motion may have been filed outside the 30-day window originally ordered, in the circumstances of this case the court will not strike the motion on grounds of untimeliness.

event, the search was consensual. By this argument, there was no *Terry* stop, and even if there was, such was supported by articulable suspicion sufficient to justify the stop and further investigation. A hearing on the motion was conducted on March 2, 2012. Additional testimony from Officer McClintick was taken at the continuation hearing on April 18, 2012.

A.

Testimony from the hearings was as follows. On January 24, 2011, at approximately 3:00 a.m., Officer Tim McClintick ("McClintick"), a three-year veteran of the St. Petersburg Police Department ("SPPD"), was on routine patrol in the area of 34th Street and 5th Avenue South, St. Petersburg. As was the custom for his shift, officers assigned in this area traveled to the area of the Choice Food Store ("CFS"), a local gathering place for individuals leaving the nightclubs in this area. He parked approximately one block north of the CFS. He described this area as a high crime area. He next heard gunfire in the area east of that location and he left to investigate. He found nothing. At approximately 3:20 a.m., he received a dispatch directing him back to the CFS in regard to a person with a gun. This dispatcher advised that a caller named "Ashley" reported a man shooting a gun at a club. The man was described as getting out of a silver Chrysler vehicle with possible tag number 646VCE and he was said to be at the CFS. The individual was identified as a black male wearing all white, approximately 6 feet tall, and 27 years of age.[3]

---

[3]At the follow-up hearing with McClintick, he testified about the printout of the transmissions with his dispatch from that evening. *See* (Gov't Ex. 1). It reflects he learned that "Ashley" was reporting that there was a black male firing off shots at a club but that he was now inside the CFS. At the club, he had gotten out of a Chrysler vehicle with possible tag #646VCE. At that point, Ashley ended the call. Efforts were made to call her back. Contact was again made with Ashley and she described the person with the gun as a black male wearing a white shirt and white pants, 27 years of age, 6 feet tall, thin build. Ashley declined to give her last name but she agreed to talk with the officers if they needed further

2

McClintick drove back to the CFS and parked in the adjacent parking lot for MJ Fashions. He observed a silver Chrysler Pacifica parked in the lot. There were two people approaching the vehicle. He suspected that the vehicle was the one referenced in the call. The license tag was confirmed. By his account, he approached the passenger side of the vehicle and asked the passenger if he could speak with him. The passenger was dressed in all white and he identified himself as Kareem Cusick ("Cusick" or "Defendant"). McClintick could not recall his actual conversation, but typically he would have asked for "demographic" information, such as name, age, and where he was coming from. By McClintick's account, another officer, Officer Brian Saylor ("Saylor"), obtained consent to search the vehicle. Regarding the consent, McClintick heard Cusick state that this was his wife's car, that they could search it, and that anything inside was his. He saw Saylor enter the passenger side of the car. Thereafter, Saylor gave a "Code 0." This signal alerted the other officers that a weapon or gun was found within the vehicle. McClintick then handcuffed Cusick and placed him in the rear of his cruiser. McClintick was shown the weapon. He next advised the Defendant of his *Miranda* rights. The Defendant agreed to speak. He acknowledged he was a felon and knew he should not have the gun. He purchased the firearm in Sarasota for $200 and he advised that he bought it for protection of his daughter.

---

information. *Id.* The notes suggest that McClintick was already out of his cruiser with two individuals when contact was reestablished with Ashley and she relayed this last bit of information. However, according to McClintick, he had the identifying information concerning the individual before he approached the Defendant. These notes reflect that the whole of this encounter took place within a matter of minutes.

Initially, the driver of the vehicle, Earl Jones ("Jones"), was also detained. After it was ascertained that he had no connection with the firearm, he was released as was the vehicle. Jones was permitted to drive the vehicle away.

McClintick denies the use of any threats, force, or violence at any time during his encounter with the Defendant.

On questions by defense counsel, McClintick indicated that he prepared a report that reflects a slightly different version, namely, that a black male in all white was getting into the vehicle as he approached. As the officer approached, the passenger (Cusick) stepped out of the vehicle. In any event, the officer's car was not blocking Cusick's vehicle from leaving. As he approached Cusick, McClintick's hand was not on his gun. He did ask for identification, which was given. He denies doing a pat-down. He began talking with Cusick outside the vehicle. The consent to search was given after he began speaking with Cusick. At no time was Cusick told that he had a right to refuse the search of the vehicle.

In response to questions from the court, McClintick testified that he did not know Cusick before that evening. The source of the phone call was known only as "Ashley." Ashley had left a phone number but no other information. As he arrived, he stopped 25 to 30 feet from the Pacifica vehicle. He observed the passenger enter the vehicle. The officer approached and asked him to step out of the vehicle. The officer began his demographic conversation with him about five feet from the vehicle. While speaking with Cusick, Cusick said it was his wife's car, go ahead and search it. The officer never asked Cusick to search the car, and by his account, Cusick simply volunteered his statement. Saylor conducted the search.

4

Saylor testified that he was also familiar with the CFS and routinely went to that area around 3:00 a.m. when the clubs closed. He too received a dispatch of a man with a gun. He too was in uniform driving a marked cruiser. When he arrived, McClintick and several other officers were standing around a silver Chrysler Pacifica vehicle. McClintick was standing outside the vehicle on the passenger side speaking with a person he identified as the Defendant. The Defendant was not cuffed and no guns were drawn (at any time). He parked his cruiser and approached. He heard the Defendant indicate, spontaneously, that the vehicle was his wife's car, that he was in charge of it, that they could search it, feel free to search it, and anything inside the vehicle was his. Upon hearing this statement, Saylor believed he had consent to search the vehicle. Upon opening the right passenger door, he observed an ammunition magazine in the compartment of the passenger door. Looking under the passenger seat, he saw a black handgun. At that point, he gave a "Code 0" to alert the other officers. McClintick detained the Defendant. Saylor then walked to the driver's side where he detained Jones, the driver. Jones was ultimately released along with the vehicle.

In response to defense questions, Saylor added that he approached McClintick and Cusick and was standing near them when Cusick spontaneously gave consent to search the car. No one explained to Cusick that he did not have to consent to the search.

The Defendant called two witnesses and testified in his own behalf. According to Stevie Murph ("Murph"), he was at the scene of the CFS on the evening of this encounter. He too had been visiting the clubs and went to the CFS area after the clubs closed. His vehicle was parked on the driver's side of the Defendant's vehicle. He exited his car and he observed a police officer and someone walking back to the car from the area of the gas

5

pumps. This was a distance of about 15 yards from where they walked to next to the vehicle. He heard the police officer ask the person for permission to search the car and the person said "no." The police searched it anyway. By his account, the person was not inside the vehicle and the door to the vehicle was not open. Murph testified that he later met Cusick when both were incarcerated in Pinellas County Jail in November 2011. He overheard the Defendant describing what happened in his case and he recalled that he had been at this area of the CFS on that evening. Previously he did not know the Defendant.

The witness acknowledged there were a lot of people hanging around in the area that night. He did not know the person the police were speaking with (or the driver). The witness claims he was right next to the car on the driver's side that night. The police did not draw their guns.

Jones also testified. On the evening in question, he was with the Defendant at a local club. Jones has known Cusick his whole life. When the club closed, they traveled to the gas station. After parking the vehicle, Cusick went into the store. While he was in the store, two police cruisers pulled up to the vehicle and officers began questioning Jones. Jones saw one of the officers approach the Defendant after he exited the store. They met at the front of the cruiser. An officer asked Jones if he would consent to a search of the vehicle and Jones declined, indicating that the car was not his. Jones was asked out of the car. The officers began rummaging in the car. He heard a "Code 0." Jones denied hearing the Defendant give permission to search the vehicle as claimed by the officers. Contrary to McClintick's version, the Defendant never made it back to the passenger seat from the store. He testified that it was after they found the gun and they gave a "Code 0," that he overheard the Defendant say that

whatever was in the car was his. According to the witness, the Pacifica belonged to the Defendant's wife and he knew nothing about the firearm and ammunition.

Jones indicated that Cusick was by the cruisers when they approached him, not at the Pacifica. They were 15 feet away. Jones was not threatened by the police and neither was Cusick. Jones did not know who owned the gun. The witness denied telling the agent who interviewed him one week before the hearing that Cusick said whatever is in the car is mine before the "Code 0."

Cusick testified that on the evening in question he and Jones went to the One South club. When it closed, they drove to the area of the CFS. They parked in the lot for MJ Fashions, which is adjacent to the CFS. Cusick exited the passenger side, closed the door and went to the CFS to purchase some snacks. Upon exiting the store, he was approached by an officer who had his hand on his gun. The officer told him to stop and not make any quick moves. He was about 15-20 yards from his car at the time. The officer asked if he had any weapons on him, he advised the officer he did not. The officer said he was going to search the Defendant and the officer proceeded to pat him down. This was all done near the store. When the officer asked for identification, he produced the same. The officer and Defendant then walked to the area of the cruiser. Cusick denies that he ever re-entered the vehicle once he left it to enter the store. He denies making the reportedly spontaneous statement that the vehicle was his wife's and that the officers could search it. On the contrary, when he was asked by the officers whether they could search the vehicle, he told them no and that the vehicle belonged to his girlfriend and she was not present. When Cusick asked what was going on, why were they searching him, he was told about the 911 report of a person with a

7

gun. When asked again whether they could search the car, he again said no. They searched it anyway. Upon finding the weapon, he was arrested and read his *Miranda* rights. He acknowledged the gun was his and that it was purchased in Sarasota. He denied firing the gun that night. While speaking with the officer in the cruiser, Defendant indicated he did not want Jones getting in trouble for something he did not do. Jones was released. Cusick said he had no prior contact with these officers. Cusick testified that on the evening in question, he was wearing a white t-shirt with beige-colored pants.

Special Agent Kimberly McGrain, an ATF agent, testified to speaking with Jones on February 24, 2012, in reference to the upcoming hearing. By her account, she told Jones she was there to investigate any allegations made by Cusick or him against the officers. Among other statements, Jones indicated that he had stayed in the car at the CFS, the windows of the vehicle were down and the doors closed. As Cusick was returning to the vehicle, officers rushed toward him and began speaking with him. Jones was asked to get out of the vehicle by another officer and he did. Jones said he heard Cusick say that anything found in the car was his, and this was before the "Code 0" was given. They both were then cuffed and placed in cruisers. Jones also said that the officers could not have seen the weapon without going into the car. Jones denied giving consent because the vehicle was not his. He denied hearing anything about consent from Cusick. The only statement he heard by Cusick was that anything in the vehicle was his.

B.

By his motion, Defendant maintains that the initial stop, frisk, and search of the vehicle was unwarranted and in violation of his Fourth and Fourteenth Amendment rights.

8

By his argument, the anonymous tip provided to the SPPD was insufficient to justify his stop. Thus, he urges that the mere observance of an individual in the vicinity of a vehicle that is the subject of an anonymous and unverified tip, without more, does not provide sufficient indicia of reliability to justify the stop.[4] He also urges that the officers lacked reasonable articulable suspicion to justify the search of the vehicle as well. The Defendant maintains that he did not behave in any manner that would suggest he was engaged in criminal activity, nor did the surrounding circumstances suggest such. As a consequence, Defendant argues that the evidence obtained subsequent to the stop and as a consequence of the illegal search and arrest of Defendant should be suppressed. As asserted in the motion, in the given circumstances, the court need not reach the matter of his alleged consent to search the vehicle.

The government responds that there was no *Terry* stop in this case but even if there was, the officers had reasonable articulable suspicion to justify the stop and detention of Defendant and the search of the vehicle was based on Defendant's consent. By the government's account, the 911 call was more than an anonymous tip as the caller left a partial name, her phone number, a claim that a person was shooting a gun at a club, a description of a vehicle by make and tag number, and a general description of the person. It also notes that the officers had heard gunshots nearby, the location was a high-crime area, and the Defendant was seen wearing clothing similar to that described by the 911 caller. By this argument, the officer's contact with Defendant was a mere encounter,[5] not a stop, and resulted in consent to

---

[4] Defendant cites *Florida v. J.L.*, 529 U.S. 266 (2000); *Alabama v. White*, 496 U.S. 325 (1990); and *Adams v. Williams*, 407 U.S. 143 (1972).

[5] The government cites *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006); and *United States v. De La Rosa*, 922 F.2d 675, 678-79 (11th Cir. 1991).

search the vehicle. Even if viewed as a *Terry* stop, the government contends that the 911 call was more than an anonymous call[6] and the police had the necessary reasonable suspicion to support the stop. Given the Defendant's consent to search, it urges that there is no cause to suppress either the firearm and ammunition or any post-arrest statements.

C.

Case law recognizes three broad categories of police-citizen encounters for Fourth Amendment purposes: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests. *Perez*, 443 F.3d at 777 (citing *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)). Only the second and third type encounters implicate the Fourth Amendment and only the first and second type encounters are at issue here.

In the first type encounter, "[l]aw enforcement officers do not violate the [Fourth Amendment] merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search [ ] provided they do not induce cooperation by coercive means." *Perez*, 443 F.3d at 777 (quoting *United States v. Drayton*, 536 U.S. 194, 200-01 (2002)). On the other hand, a person is seized and the Fourth Amendment implicated if, in view of all the surrounding circumstances, a reasonable person would believe that he was not free to leave the police encounter. *De La Rosa*, 922 F.2d at 678 (citing *Michigan v.*

---

[6]The government distinguishes the facts in this case from those in *Florida v. J.L.*, *supra,* and urges that the case is more analogous to *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007); *United States v. Heard*, 367 F.3d 1275 (11th Cir. 2004); and *United States v. Talley,* 392 Fed. Appx. 129 (4th Cir. 2010).

10

*Chesternut*, 486 U.S. 567, 573 (1988); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).[7] In this second category of police-citizen encounters, the investigatory detention, the person is seized if a reasonable person in similar circumstances would believe he is not free to leave.[8] *See Perez*, 443 F.3d at 777-78. In circumstances such as these where it appears that the Defendant was at the CFS by choice and wished to remain there, "the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991)). In order to justify such a Fourth Amendment seizure, "the government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime." *Perez*, 443 F.3d at 777. "The 'reasonable suspicion' must be more than 'an inchoate and unparticularized suspicion or hunch.' While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Lindsey*, 482 F.3d at 1290 (internal citations omitted).

---

[7]For Fourth Amendment purposes, a seizure occurs "only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained." The applicable test is not a subjective one. *See Craig v. Singletary*, 127 F.3d 1030, 1041 (11th Cir. 1997) (quoting *Mendenhall*, 446 U.S. at 555).

[8]In *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the Court first approved such brief investigatory seizures of an individual "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Where the circumstances indicate that the person with whom the officer is dealing may be "armed and presently dangerous" to the safety of the officer, the officer "is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id.*

11

In deciding the issue, the court examines "the 'totality of the circumstances' to determine whether the police had a 'particularized and objective basis for suspecting legal wrongdoing.'" *Lindsey*, 482 F.3d at 1290 (citing *United States v Arvizu*, 534 U.S. 266 (2002)). In that regard, the police may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude the untrained person." *Id*. at 1290-91. Significantly, "[t]o have reasonable suspicion based on an anonymous tip, the tip must 'be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.'" *Id.* at 1291 (citing *J.L.*, 529 U.S. at 272).

Here, the government maintains that the encounter at Defendant's car was wholly consensual and did not implicate the Fourth Amendment before Defendant spontaneously said the police could search the vehicle. It urges that the mere fact that an officer approaches an individual and questions him does not constitute a seizure. *See Perez,* 443 F.3d at 778. "Factors relevant to this inquiry include, among other things: 'whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officer's present; the display of weapons; any physical touching of the suspect, and the language and tone of the voice of the police.'" *Id.* (quoting *De La Rosa*, 922 F.2d 678). As urged by the government, as measured against these criteria, there was no stop and the Fourth Amendment was not implicated by McClintick's encounter. And, given that Defendant offered his spontaneous permission to search the vehicle, the motion to suppress is without merit.

On the other hand, by the Defendant's version of these events, there was a "stop and frisk" after he exited the CFS store in circumstances indicating he was not free to leave. Stated otherwise, he was seized in contemplation of the Fourth and Fourteenth Amendments. Although Defendant denies giving consent, by his argument, even if given, it was the product of the illegal detention.

By my consideration, the encounter here was not wholly consensual as urged by the government. While it is correct that there was no show of force or authority when McClintick approached Cusick at the vehicle and began speaking with him, the evidence, even by this officer's version, reveals that he requested the Defendant to step out of and away from the car and he demanded identification from him as he made what he terms "demographic" inquiries from Cusick.[9] From Saylor's testimony, there were several other officers nearby while this was occurring. To be sure, the initial encounter was brief, lasting only a couple of minutes before Cusick purportedly gave permission to search the car and was unaccompanied by verbal threats or other coercive conduct toward Cusick by any officer. However, given all the circumstances, I think it unlikely that Cusick or any reasonable person in these circumstances would believe he was free to walk away and thus he was stopped for Fourth Amendment purposes. Obviously, if Defendant's version of these events is credited, there was a stop and frisk and the Fourth Amendment was clearly implicated. While I find it a very close issue, I conclude that McClintick articulates minimally adequate reasonable suspicion to warrant the stop.

---

[9]McClintick was vague about his initial contact with Cusick. On questioning by the court, the officer indicated that he requested the Defendant step out of the vehicle. The conversation with Cusick took place five feet away from the vehicle. The record does not reveal whether the officer kept Cusick's identification or returned it to him before the arrest.

Here, the facts demonstrate that on the evening in question, McClintick was in an area of south St. Petersburg where he routinely patrolled after the social clubs closed. While there, he heard random gunfire nearby and he left to investigate. A short while later, he received a dispatch directing him back to the area of the CFS regarding a person with a gun. He was advised that "Ashley" had called SPPD and stated that a man was shooting a gun at the club and was then at the CFS. She described that the man had gotten out of a silver Chrysler vehicle with possible tag number 646VCE. The man was described as a black male wearing all white approximately six feet tall and 27 years of age. At least insofar as the caller gave out identifying information, such was corroborated by the police prior to the encounter. Thus, when McClintick arrived at the CFS parking area he observed a silver Chrysler Pacifica, the tag for which was confirmed to be the same as that reported. By the Defendant's version, he was in the store (as Ashley had reported) and was confronted by McClintick after exiting. According to McClintick, Defendant was observed walking to the vehicle and was confronted because he (and the car) appeared to match the caller's description. While the tip did not reveal how "Ashley" knew the person she described was firing a gun, the officer had heard gunshots fired in the area and the 911 call coming close on the heals of the gunshots suggests the caller was relaying reliable information. That, coupled with the officers' corroboration of the identifying information given by "Ashley" would arguably lend credence to her statement that Cusick was the one shooting the gun at the club.

Furthermore, while the true identity of "Ashley" was unknown to McClintick, her call was something more than an anonymous tip. She gave not only a partial name but also her phone number at which she could be and was subsequently reached. Additionally, her

14

description of gunfire at the club by a man dressed in all white driving in a Chrysler vehicle with a specified tag number was capable of being, and in fact was, verified by the police before any encounter with the Defendant. Nothing about her report suggested that it did not merit further investigation by the police. It seems to me that in these circumstances, the officers would have been negligent had they not conducted a limited investigation into the occupants of this Chrysler vehicle.

While an anonymous tip alone will not supply the requisite reasonable suspicion for a stop, "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *J.L.*, 529 U.S. at 270 (citing and quoting *Alabama v. White*, 496 U.S. 325, 327 (1990)). Here, the tip included several particulars which ultimately proved accurate[10] and such supported the likely accuracy to the claim the suspect was the one firing the gun at the club. The Supreme Court credits the proposition that "because an informant is shown to be right about some things, [she] is probably right about other facts that [she] has alleged, including the claim that the object of the tip is engaged in criminal activity." *White*, 496 U.S. at 331 (citing *Illinois v. Gates*, 462 U.S. 213, 244 (1983)). Applying such logic here, the officer could reasonably suspect that the person he was confronting was the one who was firing the gun at the club. Further, while the reasonable suspicion must be reliable in its assertion of illegality, not just in its tendency to identify a determinate person, here, the officer himself had heard gunshots evidencing a dangerous and unlawful act in the neighborhood. The gunshots were heard only shortly before the 911 call that seemingly

---

[10]The only discrepancy with the descriptions given by "Ashley" was that Cusick was wearing beige pants and a white shirt rather than all white.

15

reported them. The close temporal and apparent geographic relation of this activity to that reported by the 911 caller and the discovery of the Chrysler and an individual generally matching the caller's description at the CFS shortly thereafter would support a reasonable suspicion that the events were related. Thus, by my conclusion, McClintick's investigatory stop of Cusick was made consistent with Cusick's Fourth Amendment rights.

Beyond the stop, the Defendant and friends deny that he gave consent for the search of the vehicle. While I agree that it makes little sense that a street-smart, convicted felon would spontaneously offer up his consent to search a vehicle in which he had knowingly placed a firearm, two officers testify that he did just that. Here, there is nothing before me that suggests the police were untruthful in that testimony.

The burden on the government is merely to show that the consent was freely and voluntarily given. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). The inquiry is a factual one and depends on all the circumstances. *Id.* A defendant's knowledge of the right to refuse a request to search is a factor, but "not the sine qua non of an effective consent." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) (quoting *Bustamonte*, 412 U.S. at 439). Here, Cusick's permission to search the car was spontaneously given and does not appear the product of any threat or coercion.

16

D.

Accordingly, for the reasons set forth above, it is recommended that **Defendant's Motion to Suppress Any and All Physical Evidence** (Doc. 24) be **DENIED**.

> Respectfully submitted on
> this 10th day of May 2012.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); M.D. Fla. R. 6.02.

Copies to:
Honorable Elizabeth A. Kovachevich, United States District Judge
Counsel of Record