## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

vs.                                                     CASE NO. 8:11-cr-134-T-17TBM

KAREEM ATWAN CUSICK,

_____/

## ORDER ADOPTING REPORT AND RECOMMENDATION

This cause is before the Court on the report and recommendation (R&R) issued by

Magistrate Judge Thomas B. McCoun on May 10, 2012.  Dkt. 57.  The magistrate judge

considered  Defendant's Motion to Suppress Any and All Physical Evidence (Dkt. 24), the

Government's Response in Opposition to Defendant's Motion to Suppress (Dkt. 27), and

Defendant's Supplemental Reply to Government's Response to Motion to Suppress (Dkt. 42).

The magistrate judge held an evidentiary hearing on March 2, 2012, and took additional

testimony on April 18, 2012.  After considering the live testimony of witnesses for both

parties, the magistrate judge recommended that Defendant's Motion to Suppress Any and All

Physical Evidence be denied.  Dkt. 57.

Pursuant to Rule 6.02, Rules of the United States District Court for the Middle District

of Florida, the parties had fourteen (14) days after service to file written objections to the

proposed findings and recommendations.  On July 30, 2012, Defendant filed objections to the

R&R.[1]

---

[1] Defendant sought three extensions to file his objections to the R&R, *see* Dkts. 69, 74,
and 80, and each time the Court granted his request.  *See* Dkts. 70, 75, and 81.  Finally, the Court

## STANDARD OF REVIEW

When no timely and specific objections are filed, case law indicates that the court should review the findings using a clearly erroneous standard. *Gropp v. United Airlines, Inc.*, 817 F.Supp. 1558, 1562 (M.D. Fla. 1993). However, when a party makes a timely and specific objection to a finding of fact in the report and recommendation, the district court should make a *de novo* determination with respect to that factual issue. 28 U.S.C. § 636(b)(1); *United States v. Raddatz*, 447 U.S. 667 (1980); *Jeffrey S. v. State Board of Education of State of Georgia*, 896 F.2d 507 (11th Cir. 1990). When the credibility of witnesses is an issue, as in this case, the district court can either accept the determination of the magistrate judge after an independent review of the record, or it may make its own determination after hearing live testimony and observing the demeanor of the witnesses. *United States v. Powell*, 628 F.3d 1254, 1256 (11th Cir. 2010) (internal citations omitted). The Court reviews legal conclusions *de novo* even in the absence of an objection. *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 604 (11th Cir. 1994).

## DISCUSSION

Before the magistrate judge was a motion to suppress a firearm and ammunition seized from a motor vehicle, as well as any and all statements made by Defendant subsequent to the stop and seizure of the firearm and ammunition. The magistrate judge found that the police officer made an investigatory stop in accord with the principles originally espoused by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), and a subsequent search

---

permitted Defendant to file any and all objections no later than July 30, 2012. *See* Dkt. 81.

based on the Defendant's voluntary consent to search the vehicle.  Dkt. 57, p. 16.  The

magistrate judge expressly found, after weighing the competing testimony of several

witnesses, that the Defendant voluntarily and spontaneously consented to the search of the

vehicle.  This finding would, if adopted, remove the shroud of Fourth Amendment protection

Defendant claims was violated.

  The Defendant raises several (eight to be precise) objections to the R&R: two

regarding the *Terry* stop analysis, one that is properly characterized as a request for another

oral hearing, and five that, although listed as separate objections, share a common theme – the

magistrate judge erred by finding the Defendant voluntarily consented to a search of the

vehicle.  Specifically, Defendant objects to the R&R on the following grounds: (1) the

magistrate judge improperly referred to Officer McClintick as a veteran police officer; (2) the

"failure of the R&R to acknowledge major changes in Officer McClintick's testimony;" (3)

the magistrate judge failed to discredit Officer McClintick's testimony with the dispatch

printout; (4) the magistrate judge incorrectly concluded that Defendant consented to the

search; (5) the magistrate judge incorrectly found that Defendant made certain statements

allowing the officers to search the vehicle; (6) the magistrate judge improperly concluded that

Officer McClintick articulated minimally adequate reasonable suspicion to warrant the stop;

(7) the magistrate judge fails to give proper credit to the testimony of the defense witnesses –

Stevie Murph and Earl Jones; and (8) additional hearing time is necessary to consider matters

left unaddressed.  Dkt. 83.  The Court notes that Objections 1, 2, 4, 5, and 7 are all attacks on

the magistrate judge's finding that Defendant voluntarily consented to the search.  Objections

3 and 6 are challenges to the magistrate's finding that the initial encounter was proper under

*Terry*.  Objection 8 is simply a request for an additional hearing.

The government concurs with the magistrate judge that the motion to suppress should be denied, not because it was a permissible *Terry* stop, but because the encounter and search were consensual.  *See* Dkt. 87, p. 1.

In order to determine whether the Defendant voluntarily consented to the search the magistrate judge held two different evidentiary hearings and heard live testimony from five witnesses.  Dkts. 76 and 78.  On March 2, 2012, Officer McClintick and Officer Sayler testified for the government, and Stevie Murph, Earl Jones, and Kareem Cusick (the Defendant) testified for the defense.  *See* Dkt. 78.  After hearing from these witnesses, the magistrate judge ordered another hearing, held on April 18, 2012, during which Officer McClintick testified again.  *See* Dkt. 76.   Officers McClintick and Sayler testified that Defendant spontaneously and on his own volition authorized a search of the motor vehicle. Not surprisingly, the Defendant, Mr. Murph, and Mr. Jones each testified to the contrary, leaving the magistrate judge to determine whose version of the story to believe.  After the two evidentiary hearings, the magistrate judge credited the police officers' testimony and found that "[Defendant] Cusick's permission to search the car was spontaneously given and does not appear the product of any threat or coercion." (Dkt. 57, p. 16).  This Court, therefore, will begin its analysis by determining whether the record evidence supports that factual finding.  If the finding is not disturbed, then the inquiry is properly focused on whether the Fourth Amendment is even implicated in this case.

**A.   An independent review of the record reveals the magistrate judge's factual finding was neither internally inconsistent nor contradicted by external evidence.**

"A district court must defer to a magistrate's findings unless the magistrate's understanding of facts is entirely unreasonable." *Ballard v. C.I.R.*, 429 F.3d 1026, 1031 (11th Cir. 2005). It is not that magistrate judges hold an epistemological claim to the discovery of the truth; rather, the magistrate judge, in this circumstance, personally observed the variations in the witnesses' demeanor and tone and, based on that, is best positioned to decide who to believe and who not to believe. *See generally Anderson v. City of Bessemer City*, N.C., 470 U.S. 564, 574-75 (1985). "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 575 (citing *United States v. Aluminum Co. of America*, 148 F.2d 416, 433 (2d Cir. 1945)). Accordingly, the Court undertook – as it must – a thorough and independent review of the record to determine whether the magistrate judge's understanding of the facts is "entirely unreasonable."

The salient facts leading up to the initial encounter and subsequent search are undisputed *See* Dkt. 57, pp. 2-3. On the night of January 24, 2011, at approximately 3:20 a.m., the St. Petersburg Police Department ("SPPD") dispatched a report of a shooting at a local night club. *Id.* The report came from a caller who gave her name as "Ashley," and she further identified the shooter as a black male, wearing all white, approximately six feet tall, and twenty-seven years old. *Id.* The report stated the suspect was in a silver Chrysler vehicle with a tag number 646VCE. *Id.* Officer McClintick, a three-year veteran of the SPPD, while on routine patrol near the location, received the dispatch and proceeded to the Choice Food

Store – a local establishment that is frequented by patrons of the local night clubs after hours. *Id.* Officer McClintick observed a silver Chrysler Pacifica with matching tag numbers parked in a lot by the Choice Food Store. The stories diverge at this point.

According to Officer McClintick, the Defendant was in the process of entering the vehicle when he approached and asked Defendant if he would be willing to talk for a minute. Dkt. 78, p. 12, lines 11 - 18; *see id.*, p. 12, lines 11-18 ("I had actually walked over from my cruiser to that vehicle, to the passenger side, and had just simply asked, 'Hey, may I talk to you for a minute.'"). Officer McClintick did not have his gun drawn, and he did not raise his voice or threaten the Defendant in any other manner. Dkt. 78, p. 18, lines 3-13. Officer McClintick asked to see Defendant's identification and Defendant complied. Dkt. 78, p. 21, lines 8-9. After asking Defendant where he was coming from and other demographical information, Officer McClintick testified that the Defendant spontaneously stated, "that's my wife's car, go ahead and search it, anything you find in there is mine." Dkt. 78, p. 14, lines 4-5. Officer McClintick testified that he did not ask Defendant if he could search the vehicle, the Defendant "just volunteered that statement." Dkt. 78, p. 27, lines 22-25; *see also id.*, p. 30, lines 8-11. Only after the Defendant voluntarily consented to the search of the vehicle, according to Officer McClintick, did the other officer at the scene, Officer Sayler, look into the vehicle and locate the firearm and ammunition.

Officer Sayler corroborates Officer McClintick's version of the events. According to Officer Sayler, when he arrived on the scene Officer McClintick (along with other officers) were standing around the subject vehicle talking to Defendant. Dkt. 78, p. 33, lines 4-11. In what Officer Sayler describes as a casual conversation, he heard the Defendant spontaneously

consent to a search of his vehicle.  Dkt. 78, p. 34, lines 20-25; *see also id.*, p. 39, lines 22-25.

While on the witness stand, Officer Sayler read from his notes the Defendant's exact quote:

"This is my wife's car, I am in charge of it and you can search it, feel free to search it,

anything inside is mine."  Dkt. 78, p. 35, lines 22-25.  Officer Sayler explained that he

prepared the notes within 40 minutes of the encounter and he memorialized the statements

verbatim because "getting consent is very important . . . when it comes to the search . . . ."

Dkt. 78, p. 36, lines 8-12.  Having heard that statement, Officer Sayler believed he had

consent to search the vehicle, which he did, and he subsequently discovered the firearm and

ammunition.  Dkt. 78, p. 37, lines 3-5.  During the initial encounter and leading up to the

search, according to Officer Sayler, none of the officers drew their weapons, threatened the

Defendant, or in any way tried to coerce the Defendant to consent to a search.  Dkt. 78, p. 38,

lines 12-22.  Officer Sayler, however, testified he did not inform Defendant he did not have to

voluntarily consent to the search.  Dkt. 78, p. 41, lines 3-8.

     The Defendant tells a much different story.  Officer McClintick, according to

Defendant, did not approach him casually and simply ask a few questions.  To the contrary, he

testified he "was approached by an officer [McClintick] who had his hand on his gun and he

just told me to stop and stay where I was and don't make any quick moves."  Dkt. 78, p. 70,

lines 22-25.  Officer McClintick asked if Defendant had any weapons, and then proceeded to

search the Defendant's body by "patting" the outside of his clothes.  Dkt. 78, p. 71, lines 4-10.

After the purported "pat down," Officer McClintick asked for Defendant's identification and

asked Defendant to follow him to his police cruiser.  Dkt. 78, p. 71, lines 11-19.  Defendant

vehemently denied voluntarily consenting to the search and, instead, testified that he told

"them, no, they could not search that vehicle because the vehicle did not belong to me, it was my *girlfriend's* car and she was not present."  Dkt. 78, p. 72, lines 7-16 (emphasis added); *see also* Dkt. 78, p. 79, lines 16-18 ("He asked me can he search my vehicle.  I stated that this is my *wife's* car, you cannot search it because she's not here.") (emphasis added).  Defendant testified that "they" asked him a second time for consent, which he refused, but, notwithstanding his refusal, "they" searched the vehicle and found the firearm and ammunition.  Dkt. 78, p. 73, lines 4-10.

Two other witnesses testified on behalf of the defense.  Earl Jones, the driver of the silver Chrysler Pacifica, was present during the initial encounter and search.  *See* Dkt. 78, pp. 59-61.  Mr. Jones recalls the police officers meeting with the Defendant at the police cruiser that was parked 15 to 20 feet from the vehicle he was driving.  Dkt. 78, p. 60, line 18 - p. 61, line 15.  Mr. Jones also testified that one of the police officers asked him for permission to search the car, to which he replied, "[n]o, sir, this is not my car."  Dkt. 61, lines 16-21.  The police officers did not threaten Mr. Jones or attempt to change his answer to their request for consent, according to Mr. Jones.  Dkt. 78, p. 66, lines 4-8.  Stevie Murph testified that he was parked next to the vehicle driven by Mr. Jones on the night in question.  Dkt. 78, p. 45, lines 12-17.  Mr. Murph did not know Defendant prior to this incident and only came to know Defendant while they were both incarcerated at the Pinellas County Jail nearly a year after the incident in question.  Dkt. 78, p. 43, line 9 - p. 44, line 22.  Mr. Murph testified that "they [the police] walked the person to the truck and stuff like that, asking them can they search, search the truck, and he was like, no, because it ain't his car."  Dkt. 78, p. 45, lines 21-24.  Mr. Murph testified he was next to the silver Chrysler Pacifica, on the side opposite the police

cruiser, when he heard the refusal to consent to the search.  Dkt. 78, p. 46, lines 1-5.  Notably, Mr. Murph did not "hear the conversation that Mr. Cusick and the officer had when they were standing by the cars . . . all [he] heard was them ask him can they search the car and [Defendant] was like, no."  Dkt. 78, p. 48, lines 7-11.

The Court finds the record evidence supports the magistrate judge's finding that "[Defendant] Cusick's permission to search the car was spontaneously given and does not appear the product of any threat or coercion." Dkt. 57, p. 16.   To be clear, this does not seem to be a case in which the magistrate judge, on the one hand, partly believed the police officers' story and, on the other hand, partly credited the defense witnesses' story.  The reason for not doing so seems fairly clear: the magistrate judge had before him two entirely different versions of what transpired.  The choice between them was a binary one: either the two police officers were telling the truth or the defense witnesses were telling the truth, but not both.  In other words, either Officer McClintick had his hand on his weapon or he did not; either Defendant was "patted down" by the police or he was not; either Defendant voluntary consented to the search or he did not.  Which story to believe depended entirely on which witnesses were the most credible.  Given the choice, the magistrate judge observed the demeanor of all the testifying witnesses and believed the police officers, finding their testimony to be the more credible and truthful version of the events.  Dkt. 57, p. 16.  The Court finds nothing in this record that would disturb the magistrate judge's credibility determination.

That is precisely what the Defendant seeks by way of his First, Second, Fourth, Fifth, and Seventh Objections to the R&R.  In his First Objection, Defendant objects to the

magistrate judge's characterization of Officer McClintick as a "veteran" police officer, which, according to Defendant, "sets the stage" for an unfair credibility determination based on the officer's status.  Dkt. 83, p. 2 (citing the R&R, at Dkt. 57, p. 2).  According to Defendant, Officer McClintick's three and a half years on the police force do not merit elevating his status to that of a "veteran."  *Id.*  This characterization, it is argued, unfairly "clothe[s]" Officer McClintick with more experience and wisdom than he deserves and, therefore, the magistrate judge unfairly credited the officer's testimony.  *Id.*  The Court, however, does not read the R&R in the same vein.  Indeed, the magistrate judge's reference appears as a colloquial nod to Officer McClintick's existence as simply being what he is, a "three-year veteran of the St. Petersburg Police Department," and nothing more.  Dkt. 57, p. 2. Defendant's First Objection is therefore overruled.

In his Second Objection, Defendant objects to the magistrate judge's finding that Defendant volunteered his consent to the search on the grounds that Officer McClintick gave inconsistent testimony, thus warranting a negative credibility finding by the magistrate judge. Dkt. 83, p. 2.   Defendant asserts that Officer McClintick initially testifies (in three separate instances) that "another officer" obtained consent from Defendant to search the vehicle. When questioned by the magistrate judge, Officer McClintick testifies that he personally received consent to search the vehicle.  *See* Dkt. 83, p. 3.  Defendant argues that the facts surrounding the manner in which consent was obtained are "core issues" and, as a result of Officer McClintick's inconsistent testimony, the "R&R's conclusion that [Officer McClintick's] testimony is credible is not borne out by the record."  Dkt. 83, p. 4.

Context matters.  Reading only the selected excerpts cited in the Defendant's

Objections might initially persuade. However, the Court went further and reviewed not only the citations identified in Defendant's Objections but the entire transcript and sees nothing to disturb the magistrate judge's credibility determination. The Court notes that Officer McClintick was less precise than he could have been when explaining the details of the encounter. However, it appears evident that Defendant was speaking to Officer McClintick in the presence of several officers (including Officer Sayler) when he spontaneously volunteered his consent to search the vehicle. Because Defendant voluntarily uttered his consent to search in the presence of many, the recipient is anyone who was present – each individual officer or the collective group of officers. In other words, it is equally as accurate to state that Officer McClintick obtained consent as it is to state that Officer Sayler obtained consent. Defendant's interpretation, while persuasive at first blush, assumes the existence of a natural and perfect connection between the spoken word and the idea it was meant to convey; none exists.

Indeed, as Defendant's own testimony makes clear, witnesses are not always precise in the words they choose. *Compare* Dkt. 78, p. 72, lines 7-16 (testifying, "no, they could not search that vehicle because the vehicle did not belong to me, it was my *girlfriend's* car and she was not present." (emphasis added); *with* Dkt. 78, p. 79, lines 16-18 (testifying later, "[h]e asked me can he search my vehicle. I stated that this is my *wife's* car, you cannot search it because she's not here.") (emphasis added). Defendant used "girlfriend" and "wife" interchangeably throughout his testimony, because, as he explained to the magistrate judge, the Defendant considers his girlfriend to be like a wife. *See* Dkt. 78, p. 79, lines 19-21. With that clarification, Defendant removes any doubt whether he is speaking of more than one person. There is perhaps no clearer example of how context can disambiguate. When there

11

exists an ambiguity in a witness' testimony, the fact-finder must decide whether the witness

was lying, or whether the inconsistency (actual or perceived) was due to the natural handicap

of imprecise language.  It is clear, with regard to the police officers' testimony, the magistrate

judge chose the latter.  This Court is not inclined, and indeed is not permitted, to second guess

the magistrate judge on this record.

        Defendant also argues the magistrate judge rejected outright the Defendant's

testimony simply because of his "status as the accused" or because he is a "convicted felon."

Dkt. 83, p. 5.  To frame the magistrate judge's presupposition to believe the police officers'

testimony, Defendant points to the magistrate judge's statement that "[w]hile I agree it makes

little sense that a street-smart, convicted felon would spontaneously offer up his consent to

search a vehicle in which he had knowingly placed a firearm, two officers testified that he did

just that."  Dkt. 83, p. 5 (quoting Dkt. 57, p. 16).  The magistrate judge then concluded "there

is nothing before me that suggests the police were untruthful in that testimony."  Dkt. 57, p.

16.  Defendant argues that he was denied due process when the magistrate judge applied a *per*

*se* rule that a convicted felon's testimony is unbelievable.  "[I]n order to amount to reversible

error, a judge's remarks must demonstrate such pervasive bias and unfairness that they

prejudice one of the parties in the case." *United States v. Ramirez-Chilel*, 289 F.3d 744, 750,

n. 6 (11th Cir. 2002).  These statements, although in isolation and with a strained reading can

be read as indicating a preconceived bias or prejudice, are more appropriately coined as the

magistrate judge's credibility finding after hearing the live testimony.  Certainly, a *post hoc*

determination that a witness lacks credibility is not akin to a preconceived notion the witness

will lie simply because he or she is accused of a crime.

In fact, Defendant's conclusion that the magistrate judge summarily dismissed Defendant's testimony is based on a faulty premise: that the police officers' testimony was facially inconsistent and the defense witnesses' testimony was not.  For the reasons stated above, the Court does not agree that the police officers gave inconsistent testimony, although it could have been clearer.  The Court also does not agree that the defense witnesses presented a consistent story.  By way of example, Mr. Jones testified at the hearing that he heard Defendant say "[w]hatever's in the car is mine" after the police officers found the firearm in the car.  Dkt. 78, p. 62, lines 16-22; *see also id.*, p. 66, line 15 - p. 67, line 18.  Special Agent Kimberly McGrain, on the other hand, testified that Mr. Jones told her the week prior to the hearing that the Defendant made that statement prior to the search and prior to the police discovering the firearm.  Dkt. 78, p. 83, line 10 - p. 84, line 22.   Defendant's own testimony on this point tends to support Agent McGrain's version, not Mr. Jones' testimony.  Specifically, Defendant testified that he made that statement to Officer McClintick while he was alone in the back of one police cruiser while Mr. Jones was in a different police cruiser.  Dkt. 78, p. 74, lines 12-25.  It is difficult to conceive how Mr. Jones heard a statement that, by Defendant's own account, was made only in the presence of Officer McClintick in the back of a separate police cruiser.  That Mr. Jones heard the statement is further support for the magistrate judge's finding that Defendant voluntarily and spontaneously consented to the search while he and Mr. Jones were both outside casually talking with the police officers.  Accordingly, Defendant's Second Objection is overruled.

Defendant argues in his Fourth Objection, in the alternative and without conceding Defendant actually gave consent to search, that Officer Sayler exceeded the scope of the

consent because Defendant was only addressing Officer McClintick in conversation.  Dkt. 83,

p. 11.  No citation is provided to support the general proposition that consent voluntarily

given in the presence of several officers is limited to only the officer with whom the subject is

actively engaged in conversation.[2]  Indeed, the Court found none.  Rather, the scope of a

general statement of consent, while not limitless, is generally "constrained by the bounds of

reasonableness."  *United States v. Emanuel*, 440 Fed. App'x 881, 884 (11th Cir. 2011).  There

was no testimony in the record that Defendant consented to a search under the condition,

express or implied, that Officer McClintick (and no one else) conduct the search.  Absent such

testimony, the Court finds it was entirely reasonable for Officer Sayler (as an individual

member of the collective group to which Defendant directed his consent) to act upon

Defendant's freely given consent to search as if it were directed expressly at him.

Defendant's Fourth Objection is overruled.

The remaining arguments in the Fourth Objection, along with Defendant's Fifth and

Seventh Objections, are additional efforts to persuade the Court to reject the magistrate

judge's credibility determination.  For example, because the officers did not express hostility,

draw their weapons, or even ask for consent to search, Defendant contends "human

sensibilities" should persuade this Court to disbelieve the police officers that Defendant freely

and voluntarily consented to the search.  Dkt. 83, p. 12.  Defendant further suggests that

---

[2] The two cases cited to by Defendant are factually inapposite.  In *United States v. Blake*, 888 F.2d 795 (11th Cir. 1989), the Court concluded that the police went beyond what was authorized – a search of the person – by touching the defendant's genitals in a public place.  The Court questions the Defendant's citation to and quotation of *United States v. Ellis*, 971 F.2d 701 (11th Cir. 1992), which is a case discussing a search warrant directed at an erroneous address. Notably, the quoted excerpt attributed to the *Ellis* case is not even found in that opinion.

"collective experience" teaches and "hundreds of [other] cases establish[]" a much different course of events that are inconsistent with the police officers' testimony and, therefore, the magistrate judge should have disbelieved the police officers' testimony. *Id.* at pp. 12-13. The Court rejects these arguments as unpersuasive attempts to divert the analysis away from the specific facts and circumstances in the instant case.

Defendant, in his Seventh Objection, argues that the magistrate judge did not afford sufficient weight to the defense witnesses' testimony. Interestingly, on the one hand, Defendant asks this Court to adopt the defense witnesses' story over that of the police officers and, on the other hand, ostensibly concedes that the defense witnesses' testimony is at times inconsistent. *See* Dkt. 83, p. 4 ("Here it's important to note to the extent the defendant's witnesses do not fit their story together like a finely woven tapestry, their story nonetheless makes sense in light of their different positions."). There is simply no basis to overrule the magistrate judge's credibility determination and the Court will not do so. The Court, having independently reviewed the transcript testimony of all the witnesses, finds no internal inconsistency or other extrinsic evidence to indicate the magistrate judge's credibility finding is erroneous. Thus, the Court will decline to hold an evidentiary hearing as requested in Defendant's Eighth Objection to the R&R.[3]

**B.   The Defendant's spontaneous and voluntary consent does not**

_____

[3]The Court also declines Defendant's invitation to relitigate matters that he had ample opportunity to explore during the first two evidentiary hearings. *See, e.g.*, Dkt. 83, p. 17 ("For example a rehearing addressing among other things why Sayler thought it was reasonable to search when he was not a participant in the conversation with Mr. Cusick?"). No explanation is provided to explain why Defendant's counsel could not have cross-examined Officer Sayler on this point during the initial evidentiary hearing before the magistrate judge.

**implicate the Fourth Amendment.**

In light of this Court adopting the magistrate judge's finding that Defendant voluntarily and without threat or coercion consented to the search of the vehicle, the proper focus in the remainder of the analysis is to determine whether the Fourth Amendment was implicated during the police encounter.  In a broad sense, the Eleventh Circuit categorizes encounters between police officers and citizens into three types, each with a different level of Fourth Amendment scrutiny: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).  A consensual encounter between a police officer and a citizen, i.e., the first type of encounter, will not implicate Fourth Amendment scrutiny.  This Court, accepting as true the facts and underlying credibility determinations found by the magistrate judge, concludes that Defendant's interaction with the police was a consensual encounter and the Fourth Amendment was not implicated.[4]

The government bears the burden of proving voluntary consent during a casual

---

[4]The magistrate judge held it was "unlikely that Cusick or any reasonable person in these circumstances would believe he was free to walk away and thus he was stopped for Fourth Amendment purposes."  Dkt. 57, p. 13.  The Court adopts all of the magistrate judge's factual findings, but, on a *de novo* review, respectfully disagrees with the legal conclusion that Defendant was stopped for Fourth Amendment purposes.  *See Cooper-Houston*, 37 F.3d at 604.  Even if the initial encounter with the Defendant could be characterized as a "seizure," however, the specific information provided by "Ashley," which was corroborated by the Defendant dressed in nearly "all white" as he approached a silver Chrysler with matching plates, gave the officers a reasonable and articulable suspicion sufficient to warrant the initial stop.  *See United States v. Reed*, 402 Fed App'x 413, 416 (11th Cir. 2010).  The Court fully considered Defendant's Third and Sixth Objections and finds them wholly lacking in merit.  Of course, all of this is of no consequence because the magistrate judge found, and this Court agrees, that the Defendant voluntarily and spontaneously consented to a search of the vehicle.

encounter in view of the totality of the circumstances. *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (internal citations omitted). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *Perez*, 443 F.3d at 777-78. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may a court conclude that a seizure has occurred." *Jordan*, 635 F.3d at 1186 (quoting *Terry*, 392 U.S. at 19, n. 16) (internal quotations omitted). If a citizen's cooperation is obtained only through coercive means, the encounter is no longer consensual and the citizen's Fourth Amendment rights are implicated. *United States v. Drayton*, 536 U.S. 194, 201 (2002).

Whether a reasonable person would believe that he was not free to leave is, as the Eleventh Circuit aptly explained, an imprecise test. *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991). The Court is guided in its analysis, however, by considering: whether the police block or impede the citizen's path; whether the police retain identification; the citizen's age and educational level; the length of detention and questioning; the number of police officers present; the display of weapons; whether there is physical contact with the citizen; and the language, tone, and demeanor of the police. *See United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). On this point, two cases are particularly instructive: *De La Rosa*, 922 F.2d 675; and *Perez*,

443 F.3d 772.

In *De La Rosa*, the police followed a suspicious individual into a gated residential parking lot and one of the officers managed to drive through the gated entry prior to its closing.  922 F.2d at 677.  After the suspect parked and began walking to his apartment, the detective parked his unmarked police car directly behind the suspect's vehicle, approached the suspect and asked to speak briefly.  *Id.*  The suspect agreed.  *Id.*  The detective was in plain clothes and had his weapon holstered.  *Id.*  At the detective's request, the suspect provided his identification, which was retained when the detective asked for consent to search the vehicle. *Id.*  The detective then handed the identification to a second officer and proceeded to search the vehicle.  *Id.*  The detective found a notebook in the vehicle that contained inscriptions related to various illegal narcotic transactions.  *Id.*  After a brief, voluntary jaunt to the residence of a suspected co-conspirator (where the police found no contraband), the police asked the suspect if they could search his apartment and he consented (where the police found $378,000, an electric money counting machine, and other ledgers).  *Id.* at 677-78.  The suspect moved to suppress the evidence and all subsequent statements made as violative of the Fourth Amendment.  *Id.*  Affirming the district court, the Eleventh Circuit held that a reasonable person would have believed, under the totality of the circumstances, he was free to terminate the police encounter.  *Id.*  The Court specifically held that the temporary retention of a license did not preclude the suspect from terminating the encounter and going home to his apartment.  *Id.* at n. 2.

In *Perez*, an off-duty police officer in an unmarked police cruiser observed a 28-foot fishing boat attempting to dock at 1:00 a.m.  443 F.3d at 775.  The officer's suspicions were

aroused by the "awkward" handling of the fishing vessel and the fact the four men on board

appeared "very clean" and "neat," which was inconsistent with people returning from a

fishing trip. *Id.* The officer testified that he briefly flashed his blue lights to identify himself

as a police officer, he then approached the group of men and asked if they were okay. *Id.* at

778. When the officer asked if they had identification, without specifically asking to see it,

each of the four men produced a Florida driver's license. *Id.* at 778. The defendant offered to

produce the registration for the boat and asked the officer if he wanted to come with him onto

the vessel. *Id.* at 775. Unable to locate the documents, the defendant was informed by

another passenger that they were in the cabin. *Id.* The defendant began speaking in a loud

voice as he approached the cabin door and appeared "nervous." *Id.* at 775. The officer

located four illegal Cuban nationals inside the cabin. *Id.* The district court denied

defendant's motion to suppress, reasoning that the officer did not perform any acts to indicate

the men were being detained, despite the fact he was in uniform and flashed his blue lights.

*Id.* at 775. The Eleventh Circuit, noting that the officer's vehicle never obstructed the

defendant and that the offer to board the boat and enter the cabin was voluntary, concluded

that the encounter was consensual and did not result in a Fourth Amendment violation. *Id.* at

778.

  The facts in this case, as determined by the magistrate judge, lead to the same result as

*Perez* and *De La Rosa*. The magistrate judge, after weighing the credibility of the witnesses,

did not believe Defendant's version of the events and found that Officer McClintick

approached Defendant with no showing of force or authority.[5]  Dkt. 57, p. 13.  Officer

McClintick asked Defendant to step out of or away from the vehicle, asked Defendant for

identification, and made "demographic" inquiries from the Defendant.  *Id.*  In response to a

question by Defendant's counsel, Officer McClintick testified that his police car was not

obstructing the vehicle and Defendant could have pulled away if he wanted to.  Dkt. 78, p. 29,

lines 11-16.  The magistrate judge found the initial encounter to be "brief, lasting only a

couple of minutes before Cusick [Defendant] purportedly gave permission to search the car

and was unaccompanied by verbal threats or other coercive conduct toward Cusick

[Defendant] by any officer."  *Id.*; *see also* Dkt. 57, p. 16 ( "[Defendant] Cusick's permission

to search the car was spontaneously given and does not appear the product of any threat or

coercion.").  Importantly, the Defendant's path was not blocked and the police approached

him on the street in a casual tone, without any showing of force.   Without the police even

asking, Defendant felt compelled to spontaneously and voluntarily consent to a search of the

vehicle.  Under the totality of the circumstances, the Court finds that Defendant could have

terminated the encounter, returned to his vehicle and left the scene.

   Indeed, the only factor that even arguably tips the balance in favor of Defendant is the

---

[5]As noted by the magistrate judge, "[o]bviously, if Defendant's version of these events is
credited, there was a stop and frisk and the Fourth Amendment was clearly implicated." Dkt. 57,
p. 13.  Specifically, Defendant testified he "was approached by an officer [McClintick] who had
his hand on his gun and he just told me to stop and stay where I was and don't make any quick
moves." Dkt. 78, p. 70, lines 22-25.  According to Defendant, Officer McClintick asked if
Defendant had any weapons, and then proceeded to search the Defendant's body by "patting" the
outside of his clothes. Dkt. 78, p. 71, lines 4-10.  The Court, as already discussed, does not find
the magistrate judge's credibility determination "unbelievable" and, therefore, will not credit
Defendant's testimony.

fact that Officer McClintick may have retained Defendant's identification.  Dkt. 57, p. 13, n. 9 ("The record does not reveal whether the officer kept Cusick's identification or returned it to him before the arrest.").  Although it may be unclear whether the identification was retained, the record evidence is undisputed that Officer McClintick asked for identification and Defendant provided it.  Dkt. 78, p. 71, lines 12-14 ("[H[e asked me, did I have any identification.  And I told him, yes, I did, and I provided my identification.").  Here, there is nothing to suggest the officer showed any force or coerced the Defendant into compliance.  As the Eleventh Circuit has held, temporarily retaining a license will not preclude a finding that a citizen could terminate the encounter.  *De La Rosa*, 922 F.2d at 678, n. 2; *see also Perez*, 443 F.3d at 777 ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, *ask for identification*, and request consent to search luggage – provided they do not induce cooperation by coercive means.") (emphasis added).  Here, Defendant handed Officer McClintick his identification, chose to speak casually with him and then voluntarily consented to search the vehicle.   On balance, a reasonable person would believe that he was free to terminate the encounter with the police officers and leave.

After a careful and independent review of the file, including all motions, responses and hearing transcripts, the Court will overrule all objections raised by the Defendant.  The Court accepts and adopts all factual findings, and those legal conclusions that are not inconsistent with this Order, made by the magistrate judge.  Accordingly, it is

**ORDERED** that the report and recommendation, May 10, 2012 (Dkt. 57), be **adopted** and **incorporated by reference** and Defendant's Motion to Suppress Any and All Physical

Evidence (Dkt. 24) be **denied**.

      **DONE and ORDERED** in Chambers, in Tampa, Florida, this 19th day of September, 2012.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to:
All parties and counsel of record
Assigned Magistrate Judge